IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | |
|---|---|
| WILLIS A. BRAILEY,<br><br>                                      Plaintiff,<br><br>          v.<br><br>ADVANCE AMERICA CASH ADVANCE<br>CENTERS OF VIRGINIA, INC.,<br><br>                                      Defendant. | Civil Action Number 3:08cv365 |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter came before the Court for a bench trial on July 22, 2009. After consideration of the pleadings, testimony, exhibits, and argument, the Court makes the following Findings of Fact and Conclusions of Law, pursuant to Federal Rule of Civil Procedure 52. The Court incorporates by reference the parties' exhibits and the Court's record.

**I. FINDINGS OF FACT**

1.       Willis A. Brailey ("plaintiff" or "Brailey") is African-American.

2.       Prior to his hiring by Advance America ("defendant" or "Advance"), Brailey was interviewed by Robert Ivison ("Ivison"), Advance's Regional Director of Operations. After an in-person interview with Brailey, Ivison recommended hiring him.

3.       Prior to hiring Brailey, Advance conducted a background check on him, which showed no criminal arrests or convictions.

4.       On September 5, 2006, Brailey started working for Advance as a Center Manager in Hanover, Virginia ("Hanover Center"). As a Center Manager, Brailey's responsibilities

1

included opening the Hanover Center, setting the work schedules, and making loans to customers.

5. On September 5, 2006, Brailey was provided with the Advance America Employee Handbook ("Handbook"). As acknowledgment of receiving the Handbook, Brailey signed a "Disclaimer," which stated, *inter alia*, that Advance employees were employed at-will.

6. The Handbook's section regarding arrests and convictions states:

> When a current Employee is arrested for or convicted of a misdemeanor or felony, he should notify his supervisor immediately…. Management will analyze the facts of each individual situation and make a job-related business judgment in each instance.
>
> ….
>
> An arrest in and of itself may be sufficient to cause an employee to be suspended pending the outcome. A conviction for a misdemeanor will be evaluated by management to determine if it in itself constitutes grounds for suspension, personal leave of absence[,] or termination. A felony conviction will result in the immediate termination of an Employee's employment.

7. In addition, the Handbook includes a non-exhaustive list of conduct that may result in corrective action up to and including termination of employment at management's discretion. The list includes violating any guideline, policy, or procedure set forth in the Handbook and "[a]ny conduct, activity[,] or behavior, which in management's sole discretion, is deemed inappropriate, improper[,] or otherwise not in the Company's best interest."

8. During Brailey's employment, Advance closed the Hanover Center. As a result, Brailey was transferred to the Forest Hill Center. As this Center already had a Manager, Brailey became Assistant Manager, although his pay remained the same.

9. When Brailey became the Assistant Manager at the Forest Hill Center, his duties were similar to the duties he had as a Manager at the Hanover Center. As part of his duties, Brailey was partially responsible for depositing checks and cash at the bank.

10. On April 3, 2007, the first day Brailey was assigned to the Forest Hill Center, he arrived at the Center unprepared to work, insisting that it was his day off.

11. The following week, on April 9, 2007, Brailey violated the dress code by wearing a stud earring, an infraction for which he received a written warning.

12. On April 10, 2007, Manina Harris ("Harris"), an Advance Training Manager, informed Brailey that he had to park his car in front of the Forest Hill Center. In response, Brailey asked whether a written parking policy existed. Harris said it did not.

13. Rather than move his car, Brailey called Advance Corporate Headquarters, where he spoke with Judy Brown ("Brown"), Advance's Director of Human Resources. Brown told Brailey that there was no written parking policy, but that as an operational matter and a matter of common sense, employees were to park in front of, and as close as possible to, their Centers. Thereafter, Brailey moved his car as directed.

14. Brown became suspicious of Brailey's questions about the parking policy, so she ordered a background check ("Accurint report") on Brailey from Accurint, an Advance vendor for criminal reports. Accurint reports are completed the same day that they are ordered, so she received the report on April 10, 2007.

15. The Accurint report revealed that Brailey was arrested in July 2006 for (1) assault and battery, (2) abduction and kidnapping, and (3) grand larceny.

16. The Accurint report further stated that on September 14, 2006, which was after he commenced work at Advance, (1) Brailey was convicted of assault and battery and (2) the abduction and kidnapping and grand larceny charges were certified to a grand jury.

17. Brown was surprised by these results, as Advance policy requires employees to notify their superiors of arrests and convictions. Brown therefore contacted Ivison to determine

whether he was aware of the pending cases. Ivison indicated that he was unaware of the charges and convictions, for Brailey had failed to notify him of these events. Both Brown and Ivison considered these matters to be open criminal cases about which Advance needed to be aware.

18. Brown and Ivison decided to fire Brailey because of his conviction and his failure to notify Advance of the criminal matters, which they interpreted as violating Advance policy.

19. Brown verified the Accurint results through eQuest, the company that conducted the pre-hiring background check. The eQuest report, completed on April 23, 2007, confirmed the information in the Accurint report.

20. On April 11, 2007, Gregory and Ivison notified Brailey of his discharge. In their meeting, Brailey attempted to explain the circumstances surrounding the criminal matters. Ivison stated such explanations were unnecessary because Brailey was being terminated for failing to notify Advance of the criminal proceedings.

21. Brailey's replacements at Advance were also African-American.

22. On May 25, 2007, Brailey filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC"). The Charge alleged, in pertinent part:

> I began employment on September 5, 2006, as the Manager at the Chamberlayne Road, Mechanicsville, VA office. Effective on or around April 2, 2007, I was transferred to the Forest Hill Avenue, Richmond, VA office as an Assistant Manager. On April 11, 2007, I was discharged.
>
> Marsha Gregory, District Operations Manager, upon the closing of the Chamberlayne Road office, informed me that the only Manager vacancy was in the Amelia office. She stated that she thought I did not want to drive that far, which was not true.
>
> In notifying me of my dismissal, Rob Iverson, an area official, stated that another background check was done on me, and it revealed indictments. (To my knowledge these indictments had been dismissed.)
>
> I believe that I was demoted and discharged because of my race, Black, and sex, male, in violation of Title VII of the Civil Rights Act of 1964, as amended, and because of my age, 61, in violation of the Age Discrimination in Employment Act of 1967.

23. Brailey reviewed the Charge before he signed it.

24. Brailey received a right to sue letter and commenced the instant action.

25. Brailey's assault and battery conviction was dismissed on appeal in November 2006. The grand larceny and abduction and kidnapping indictments were dismissed in October 2006.

26. According to Brown, Advance would have reinstated Brailey had the eQuest report indicated that the criminal information in the Accurint report was inaccurate.

27. In one previous instance, Advance reinstated an individual whose alleged criminal infraction was the result of identity theft rather than the actions of the Advance employee.

## II. CONCLUSIONS OF LAW

Title 42, United States Code, Section 2000e, more commonly known as Title VII (of the Civil Rights Act of 1964), provides that it is "an unlawful employment practice for an employer … to discharge … or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's race." Title VII requires that a plaintiff file an EEOC Charge of Discrimination against his employer within one hundred eighty days of the alleged unlawful conduct. 42 U.S.C. § 2000e-5(e)(1). This filing requirement is an absolute prerequisite to a Title VII suit in federal court. *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979) ("[A] plaintiff in a civil action under Title VII must allege and prove filing of a timely charge of discrimination with the Equal Opportunity Commission together with receipt of, and action on, a statutory notice of his right to sue."). Moreover, the EEOC Charge "defines the scope of the plaintiff's right to institute a civil action," *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002) (citing *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000)), insofar as the scope of a permissible civil

lawsuit under Title VII is limited to the "administrative investigation that can reasonably be expected to follow the charge of discrimination," *ibid.* (quoting *Chisholm v. United States Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981)).

Under Title VII, both discriminatory treatment and discriminatory impact claims are actionable. As such, a prospective plaintiff must satisfy the administrative exhaustion requirement for each cause of action. *See Daso v. Grafton Sch., Inc.*, 181 F. Supp. 2d 485, 489 (D. Md. 2002) (noting that a Title VII suit can address "any kind of discrimination like or related to allegations contained in the charge and growing out of such allegations during the pendency of the case before the [EEOC]" (quoting *Hill v. Western Elec. Co.*, 672 F.2d 381, 390 n.6 (4th Cir. 1982))); *see also Rogers v. Federal Express Corp.*, No. 06-CV-0313-CVE-PJC, 2007 WL 2891550 (N.D. Okla. Sept. 28, 2007) (finding that a plaintiff's failure to allege a facially neutral employment practice with a disproportionate impact on a protected class in his EEOC charge meant he failed to exhaust administrative remedies on his disparate impact claim). Brailey, as the plaintiff, bears the burden of establishing that the Court has subject matter jurisdiction over his claims. *Jones v. American Postal Workers Union*, 192 F.3d 417, 422 (4th Cir. 1999). To support his contention that he satisfied the administrative exhaustion prerequisite on both his disparate impact and disparate treatment claims, Brailey proffers his EEOC Charge and his EEOC Intake Questionnaire. P. Ex. 6, 7. However, neither the Charge nor the Intake Questionnaire identifies a facially neutral employment practice with a disproportionate impact on a protected group. Moreover, although the Intake Questionnaire alleges facts that could theoretically be connected to lead to such a conclusion, insofar as it discusses in section five an indictment-based dismissal and then alleges in section six that no African-Americans work in certain positions at Advance, such a connection is so attenuated as to be effectively nonexistent.

P. Ex. 6.  Further, the EEOC Charge based upon the Intake Questionnaire alleged only that Brailey was demoted because of his age, race, and sex.  P. Ex. 7.  Finally, Brailey does not present any admissible evidence that the administrative investigation considered disparate impact allegations.  Accordingly, as Brailey failed to exhaust administrative remedies on his disparate impact claim, the Court lacks subject matter jurisdiction over said claim.

The Court notes that even if subject matter jurisdiction existed, the disparate impact claim would fail.  Brailey did not meet his burden on this claim, for he did not identify a specific challenged employment practice or establish causation.  *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988).

The Court thus considers Brailey's disparate treatment claim, for which he satisfied the administrative exhaustion prerequisite.  P. Ex. 7, 8.  In a Title VII case alleging racial discrimination, the plaintiff ultimately has the burden of presenting sufficient evidence from which a factfinder could conclude that the challenged adverse employment action was motivated, in whole or in part, by racial discrimination.  In presenting a claim of disparate treatment, a Title VII plaintiff can proceed on a "pretext theory" wherein he demonstrates that the employer's proffered rationale for the adverse employment action was merely a pretext for discrimination.  Alternatively, the plaintiff can proceed on a "mixed-motive" theory wherein he demonstrates through direct and/or circumstantial evidence that even if the employer's reason is true, racial discrimination also motivated the action.  Yet as the Fourth Circuit has noted, "[r]egardless of the type of evidence offered by a plaintiff as support for [his] discrimination claim (direct, circumstantial, or evidence of pretext), or whether [he] proceeds under a mixed-motive or single-motive theory, '[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional

discrimination.'" *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 286 (2004) (en banc) [hereinafter *Hill*] (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000)).

In *McDonnell Douglass Corp. v. Green*, the United States Supreme Court established a burden-shifting framework for Title VII cases proceeding under the "pretext theory." 411 U.S. 792 (1973). Under the *McDonnell Douglass* framework, a plaintiff must first establish a *prima facie* case of discrimination. *Id.* at 802. This is a low and flexible standard, dependent upon the facts of the case. *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 575-77 (1978); *see Miles v. Dell, Inc.*, 429 F.3d 480, 485-88 (4th Cir. 2005). Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to provide legitimate and non-discriminatory reasons for the termination. *McDonnell Douglass*, 411 U.S. at 802. This is a burden of production, not persuasion, *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007), and can be met by producing evidence from which can be drawn a rational finding that discrimination was not the reason for the adverse action. *Reeves*, 530 U.S. at 142; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993). After the defendant provides a non-discriminatory reason for the action, the presumption of employer discrimination disappears. *Hicks*, 509 U.S. at 506-07. Thereafter, the plaintiff has the burden of showing by a preponderance of the evidence that the defendant's legitimate and non-discriminatory reason for the discharge was a pretext for discrimination. *McDonnell Douglass*, 411 U.S. at 804. "At this point, the burden to demonstrate pretext 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination.'" *Hill*, 354 F.3d at 285 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). Throughout the entire burden-shifting framework, the plaintiff bears the ultimate burden of proving intentional discrimination. *Reeves*, 530 U.S. at

143; *Burdine*, 450 U.S. at 253. The plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.

As noted in the Court's May 6, 2009 Memorandum Opinion, Brailey's allegation is best evaluated as a claim of disparate treatment in the enforcement of disciplinary rules.

> To establish a *prima facie* case of discrimination in the context of enforcement of employee disciplinary measures, a plaintiff must show: (1) that he is a member of a class protected by Title VII; and (2) that he did not violate the rule in question, *see Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir. 1980), or that he received more severe punishment than employees outside the protected class who engaged in comparable misconduct. *See Cook v. CSX Trans. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993); *Moore v. City of Charlotte*, 754 F.2d 1100, 1105-06 (4th Cir. 1985).

*Dunn v. City of High Point*, 68 F. Supp. 2d 672, 679 (M.D.N.C. 1999); *accord Jones v. Giant Foods, Inc.*, No. Civ. JFM-00-3469, 2000 WL 1835393 (D. Md. Nov. 27, 2000). After the plaintiff establishes his *prima facie* case, the employer can rebut the presumption of discrimination by showing that the decision-maker in good faith believed the plaintiff committed the violation. *Dunn*, 68 F. Supp. 2d at 680. If the employer succeeds in rebutting the presumption, the plaintiff must produce evidence that the decision-maker was in reality motivated by racial animus. *Ibid*.

Arguably, Brailey has met his burden of establishing a *prima facie* case of discrimination. An African-American, Brailey is a member of a Title VII protected class. Brailey appears to argue both that he did not violate Advance policy and that, even if he did, he was treated more harshly than another Advance employee. The first argument is as follows: Brailey was terminated for violating an Advance rule requiring disclosure of arrests or convictions of Advance employees, as he did not report his conviction and the certification of criminal charges

to a grand jury. Yet under Virginia law, the perfection of Brailey's appeal on September 14, 2006 rendered the judgment against him a nullity pending a *de novo* trial in the circuit court. *Briggs v. Waters*, 484 F. Supp. 2d 466, 472 (E.D. Va. 2007) (citing *Corbin v. Commonwealth*, 44 Va. App. 196, 208, 604 S.E.2d 111, 117 (2004) and Va. Code Ann. § 16.1-136). Thus as a matter of Virginia law, given his success on appeal, the conviction (and the also-dismissed charges), never existed — a situation reflected in the "clean" December 2007 background check Brailey submitted at the summary judgment stage. Meanwhile, at trial Brailey also argued that he was treated more severely than the unnamed Advance employee who was permitted to prove the criminal acts allegedly committed by that individual were in fact committed by someone who had stolen his identity. Specifically, Brailey argued that the other Advance employee was permitted to prove his innocence while Brailey was not allowed to explain the dismissal of his criminal charges.

These arguments have some force. Nevertheless, the disparate disciplinary treatment claim must fail. As to the claim of disparate severity of punishment, there is no information on whether the other Advance employee was or was not a member of a protected class. Further, there appears to be a qualitative difference in the employees' situations, with one individual never being involved in the criminal justice system and the other being involved, if ultimately successful in confronting the criminal allegations. Admittedly, the claim that Brailey did not violate the disclosure rule has more force, given that (1) it requires *current* employees to disclose arrests and convictions, (2) Brailey was not an employee when arrested, and (3) his post-hiring conviction technically does not exist. However, the Court need not determine whether Brailey actually violated the disclosure rule, for Advance has proven that Ivison and Brown believed in good faith that Brailey had violated the policy. Both Brown and Ivison interpreted the disclosure

requirement as encompassing any open or pending criminal matter involving Advance employees.[1]  Each interpreted the abduction and kidnapping and grand larceny charges, which were certified to a grand jury, as being pending criminal matters.  Likewise, both believed Brailey had violated the disclosure requirement for failing in September 2006 to notify Advance of the conviction, notwithstanding his immediate appeal thereof.  Notably, Brown and Ivison based their belief in Brailey's criminal conduct on a criminal background check conducted by a reputable company, Accurint, from which Advance routinely received accurate background reports.  Moreover, a detailed eQuest background report confirmed the information in the Accurint report.  The eQuest report thus both verified the information and reinforced the interpretation that these criminal matters occurred during Brailey's employment, given that a pre-hire eQuest report contained no indication of these matters.  As the Fourth Circuit has stated, "it is the perception of the decisionmaker which is relevant." *Holland*, 487 F.3d at 217 (quoting *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 444 (4th Cir. 1998)).  Thus, as Advance has proven that the decision-makers in good faith believed that Brailey had violated Advance's disclosure policy, Brailey's claim could only succeed if he were able to prove racial animus actually motivated Brown and Ivison.  Brailey introduced no evidence of any such animus.  Indeed, Brailey himself declared that Brown and Ivison fired him for his conviction, making no suggestion that either acted for racially discriminatory reasons.  Hence, Brailey's disparate treatment claim fails.

Although considering the disciplinary enforcement context to be the proper one for evaluating Brailey's disparate treatment claim, the Court will, out of an abundance of caution,

---

[1] This is certainly a legitimate interpretation of the policy, for all that it speaks in terms of "current Employees." As prospective employee must pass a background check prior to being hired, one could logically expect that no criminal matter would be pending, unbeknownst to Advance but known to the individual, at the inception of employment. Thus, it would be logical to interpret the required disclosure of arrests and convictions as encompassing any encounter with the criminal justice system that occurs during one's employment at Advance.

also analyze his claim as a traditional discriminatory discharge allegation. Under the *McDonnell Douglass* framework, plaintiffs in discharge cases can establish a *prima facie* case if they show that (1) they were members of a protected class, (2) they were qualified for the job, (3) they were discharged, and (4) they were replaced by people outside of the protected class. *Reeves*, 530 U.S. at 142. In this context, a Title VII plaintiff relying upon indirect evidence generally must establish his *prima facie* case by demonstrating that "(1) [he] is a member of a protected class; (2) [he] suffered adverse employment action; (3) [he] was performing [his] job duties at a level that met [his] employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Hill*, 354 F.3d at 285.

Brailey failed to establish a *prima facie* case of discrimination for two reasons. To begin with, Brailey's replacements at Advance were both African-American and thus members of the same protected class as Brailey. More importantly, though, Brailey did not prove that he was performing his duties at a level that met Advance's legitimate expectations at the time of his termination. Gregory testified that on April 9, 2007, Brailey was sitting at a desk, eating ice cream, and wearing an earring stud when she arrived at the Forest Hill Center following the precipitous resignation of the Forest Hill Manager. Such behavior was, at best, unprofessional. More pertinently, Brailey misbehaved multiple times during the fortnight preceding his termination, resulting in two written disciplinary reports and two employee relations calls. On April 3, 2007, the first day he was scheduled to work at the Forest Hill Center, Brailey arrived at the Center not dressed for work and insisting that it was his day off. D. Ex. 6, 7. As Harris and Gregory both testified, on April 9, 2007, Brailey violated Advance's dress code by wearing a stud earring, D. Ex. 2, and he violated Advance's parking policy by parking behind the building.

Notwithstanding the instructions to park in front of the Center, Brailey again parked behind the building on April 10, 2007. See D. Ex. 8, 9. This resulted in the issuance of another written warning, this time for insubordination in refusing to move his car as directed. D. Ex. 10. For the above reasons, therefore, Brailey failed to establish a *prima facie* case of discrimination.

Even had Brailey established his *prima facie* case, he could not have succeeded on his claim. As discussed previously, Advance terminated Brailey for a legitimate, non-discriminatory reason, namely its belief that Brailey violated Advance's disclosure policy. Believing that an employee violated company policy is a legitimate, non-discriminatory reason for termination. *See Holland*, 487 F.3d at 217; *Skipper v. Giant Food Inc.*, 68 Fed. Appx. 393 (4th Cir. 2003); *Asuncion v. Southland Corp.*, No. 96-2702, 1998 WL 71529 (4th Cir. Feb. 23, 1998); *McIntyre-Handy v. APAC Customer Servs., Inc.*, No. 4:05CV124, 2007 WL 1557122 (E.D. Va. May 23, 2007). The Court recognizes that "[t]he crucial issue in a Title VII action is an unlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment," *Beall v. Abbott Labs.*, 130 F.3d 614, 620 (4th Cir. 1997) (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 383 (4th Cir. 1995)), and therefore that the Court is not to act as a "super-personnel department that reexamines an entity's business decisions." *Ibid.* (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)). Nonetheless, the Court notes that the disclosure policy and Brown and Ivison's interpretation of it are logical and reasonably related to business necessity, given the nature of Advance's business and particularly the fact that Managers and Assistant Managers handle large quantities of cash. *See El v. Southeastern Pennsylvania Transp. Auth.*, 479 F.3d 232, 244-45 (3d Cir. 2007).

Finally, even had Brailey succeeded in establishing his *prima facie* case and/or in offering other indirect evidence of racially discriminatory motives, the defendant could take

refuge in the same-actor inference. Under the same-actor inference, the hiring and firing of an employee by the same individual within a relatively short period supports a strong inference that discrimination is not a determining factor in the termination. *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991). Here, Ivison recommended the hiring of Brailey in the fall of 2006 and the firing of Brailey in the spring of 2007. As Ivison knew Brailey was African-American when he recommended hiring Brailey, given their in-person interview, it is unlikely that racial animus motivated his decision a few months later to fire Brailey.

Accordingly, whether analyzed in the context of disparate disciplinary enforcement or basic discriminatory discharge, the plaintiff's disparate treatment claim must fail. In short, although the plaintiff's termination might not have been very fair, it was not legally impermissible.

Finally, the Court notes that the plaintiff proceeded to trial solely on allegations of racial discrimination. Thus, as the plaintiff introduced no evidence of any age-based discrimination, he abandoned any allegations that the defendant violated the Age Discrimination in Employment Act. Likewise, the plaintiff abandoned any Section 1983 claim he might have made. Nevertheless, the Court notes that the plaintiff would have lost on any Section 1983 claim given that the defendant is a private entity and there were no allegations that Advance acted under color of state law in discharging Brailey. *See Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 658 (4th Cir. 1998).

An appropriate Final Judgment Order shall issue.

July 27, 2009  /s/
DATE  RICHARD L. WILLIAMS
  SENIOR UNITED STATES DISTRICT JUDGE